1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4     UNITED STATES OF AMERICA                  4:12-mj-01184

5

6     V.                                        December 19, 2012
                                                Houston, Texas
7                                               3:00 p.m.

8     CHARLES WILLIAM CARLTON,

9     JOHN ROBERT POLINSKI
              Defendants

10

11                       IDENTITY/DETENTION HEARING

12                   BEFORE THE HONORABLE MARY MILLOY

13                   UNITED STATES MAGISTRATE JUDGE

14    APPEARANCES:

15    For the United States           Jason Scott Varnado, AUSA
                                       Office of the U. S. Attorney
16                                     1000 Louisiana, Suite 2300
                                       Houston, Texas 77002

17    For the Defendant Carlton        Terrence A. Gaiser
18                                     Attorney at Law
                                       2900 Smith Street, Suite 220
19                                     Houston, Texas 77006

20    For Defendant Polinski           Sorcha Landau, AFPD
                                       Office of the Federal Public
21                                         Defender
                                       440 Louisiana Street
22                                     Suite 1350
                                       Houston, Texas 77002
23

24    Court Clerk                      Cindy Jantowski

25    Proceedings from the official electronic sound recording;
      transcript produced by court approved transcriber.

      DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

```
1   Electronic Recording Operator        Rishona Smith
                                          U. S. District Clerk's
2                                            Office
                                          515 Rusk
3                                         Houston, Texas 77002

4   Also Present                         Cynthia Moreno
                                          Pretrial Services Officer
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                              INDEX

 2
                                                    Page
 3
   WITNESS FOR THE GOVERNMENT:
 4
       Jeremy Grube
 5
           Direct Examination by Mr. Varnado        6
 6         Cross Examination by Mr. Gaiser          29
           Cross Examination by Mr. Landau          37
 7         Redirect Examination by Mr. Varnado      44
           Examination by the Court                 44
 8
 9

10 WITNESS FOR DEFENDANT CARLTON:

11     Bradley Smith

12         Direct Examination by Mr. Gaiser        47
           Examination by the Court            48
13         Cross Examination by Mr. Varnado        49
           Cross Examination by Ms. Landau         52
14
15 ARGUMENTS:

16    By Mr. Varnado        54
      By Mr. Gaiser         56
17    By Ms. Landau         57

18 COURT FINDING           58

19

20

21

22

23

24

25


   DIGITAL SCROLL TRANSCRIPTION              281.996.7978
```

1                    THE COURT:  All right.

2                         Please be seated.

3                         In the matter of United States of America versus

4    Charles William Carlton and John Robert Polinski.

5                    Mr. Varnado, are you representing the Government

6    on those matters?

7                    MR. VARNADO:  Yes, Your Honor.

8                    THE COURT:  And Mr. Gaiser, you're here for Mr.

9    Carlton?

10                   MR. GAISER:  Yes.  Terrence Gaiser for Mr. Carlton.

11                   THE COURT:  Have you read the Pretrial Services

12   Report, Mr. Gaiser?

13                   MR. GAISER:  Yes.  I have.

14                   THE COURT:  Anything in there that you contend is an

15   error of fact that --

16                   MR. GAISER:  No.

17                   THE COURT:  -- Pretrial can correct?

18                   MR. GAISER:  No, Your Honor.

19                   THE COURT:  All right.

20                        Mr. Varnado, is there anything that you contend

21   is an error of fact?

22                   MR. VARNADO:  Not that I'm aware of, Your Honor.

23                   THE COURT:  All right.

24                        Then, I'll accept as true those statements in

25   the Pretrial Services Report.

1              Ms. Parnelli (phonetics), are you representing
2     Mr. Polinski -- oh, Ms. Landau?
3              MS. LANDAU:  Oh, no, Your Honor.
4                   It's me Sorcha Landau --
5              THE COURT:  All right.
6              MS. LANDAU:  -- who's representing Mr. Polinski.
7              THE COURT:  And have you read the Pretrial Services
8     Report?
9              MS. LANDAU:  I have, Your Honor.
10             THE COURT:  Anything you contend as an error of fact?
11             MS. LANDAU:  No, but I -- but some of the information
12    here can be corroborated.  It says that it's not corroborated,
13    but I have someone here who's able to do that.
14             THE COURT:  All right.
15                  But there's no error of fact?
16             MS. LANDAU:  Not that I'm aware of.
17             THE COURT:  Anything from the Government's side, Mr.
18    Varnado, that you contend is an error of fact?
19             MR. VARNADO:  Not that I would contend at this
20    moment, Your Honor.
21             THE COURT:  All right.
22                  Then, I'll accept as true those matters set out
23    in there, and I assume you have some witnesses, Mr. Varnado?
24             MR. VARNADO:  I do, Your Honor.
25             THE COURT:  Call your first witness.

1             MR. VARNADO:  Okay.

2                  The United States calls Special Agent Jeremy

3    Grube.

4                  Your Honor, do you mind if I question the

5    witness seated?

6             THE COURT:  I don't care, whichever.

7                  Mr. Grube, come forward, please.

8             MR. VARNADO:  Come on in.

9             COURT CLERK:  Would you, please, raise your right

10   hand?

11        (Witness sworn.)

12      SPECIAL AGENT JEREMY GRUBE, GOVERNMENT'S WITNESS, SWORN

13                       DIRECT EXAMINATION

14   BY MR. VARNADO:

15   Q  Good afternoon, Special Agent Grube.

16   A  Good afternoon.

17   Q  Could you -- if you would, please state your full name and

18   spell your last name for the court reporter.

19   A  My name is Jeremy Grube, G-R-U-B-E.

20   Q  And how are you presently employed?

21   A  I'm employed as a Special Agent with Homeland Security

22   Investigations, which is in the division of the Department of

23   Homeland Security.

24   Q  And how long have you been in that particular position?

25   A  I've been in the position since November of 2007.

1  Q   Are you assigned to any particular task force, currently?

2  A   Yes.  I've been assigned to the Grand Forks Narcotics Task

3  Force for approximately the last year and a half.

4  Q   For those of us in Houston, where's Grand Forks?

5  A   That's in the State of North Dakota.

6  Q   Okay.  And what sort of task force are you assigned to, if

7  you could state that again?

8  A   I'm attached to a Narcotics Task Force, which investigates

9  state and federal narcotics crimes.

10  Q   Okay.  Have you seen the Indictment in this case?

11  A   Yes.  I have.

12  Q   And there are a number of chemicals and substances listed

13  throughout here.

14                  I want you, if you could, please, tell the Court

15  in general what types of substances are these just by, you

16  know, a common name that are listed in the Indictment.

17  A   The substances are referred to as analogue controlled

18  narcotics.  They are, basically, hallucinogen stimulant type

19  substances.

20  Q   And when they are -- they're called analogue narcotics is

21  that because they have a substantially similar pharmacological

22  effect to narcotics?

23  A   Correct.

24  Q   Okay.  Are these also called research chemicals from time

25  to time?

Grube - Direct                                          8

1  A  Yes.  They are.

2  Q  And in general, based on your experience in your work with

3  HSI and in the drug task force how does sellers of these

4  narcotics or narcotic-like substances generally obtain these

5  products?

6  A  The sellers generally obtain these products online, or if

7  they have been introduced or if they have a connection to

8  suppliers that are generally overseas.

9  Q  Okay.

10            And during the course of your investigation, how

11  are these research chemicals or analogue controlled substances

12  generally used or ingested based on your investigation?

13  A  They can be snort -- ingested through the nose or snorted

14  through the nose in a very, very small amount in the powder

15  form.

16            In our specific case they were -- the powder was

17  diluted in alcohol or Everclear, and the solution was laid

18  over a sheet of what we call blotter paper that was in a cake

19  pan or baking pan.  Then that substance, basically, evaporated

20  or got mixed into the paper.

21  Q  Is that similar to acid paper for historical reference?

22  A  Yeah.  Similar.  Okay.

23  Q  Any other ways in your investigation that is relevant to

24  this case?

25  A  Yes.  They also took like the powder substance, and they

1  would mix it into like a melted chocolate.  And the chocolates

2  would harden, and they would put it in a Dixie cup and kind of

3  use it as what they would call mushroom chocolates.

4  Q   Okay.  Now you mentioned how folks interested in obtaining

5  these products from overseas would get them.

6              What based on your investigation -- what tools

7  would people use who wanted to sell these products for the

8  recreational uses that you're talking about?

9  A   A lot of people that were involved in the sale of these

10  products use online chat rooms.

11  Q   And what are some of the names of those online chat rooms

12  that you discovered during your investigation?

13  A   legalhighguides.com and euphoricknowledge.com.

14  Q   And what sort of information would be exchanged over these

15  chat rooms?

16  A   In some of the public and private chat rooms, people would

17  talk about the effects of some of these substances.  They

18  would also talk about like what were the good vendors or the

19  suppliers that had these products available, and they would

20  kind of talk about the procurement and, like, how they would

21  get these chemicals to their house, I guess.

22  Q   Are you one of the lead investigators on this particular

23  case, including the case against Charles William Carlton and

24  John Robert Polinski?

25  A   Yes.  I am one of them.

1  Q   Please tell the Court how this investigation first began.

2  A   In June of 2012, in Grand Forks, North Dakota we -- we

3  responded to two crime scenes where a couple of young kids in

4  North Dakota died.   At those crime scenes -- scenes it

5  appeared evident that there was some drug use, and it appeared

6  their -- their deaths were related to the use of narcotics.

7  Q   And since those deaths in June of 2012, were any autopsy

8  reports performed?

9  A   Yes.   They were performed, and they were completed in very

10  late October of 2012.

11  Q   And what was determined to be the cause of death of the two

12  particular individuals that you referenced?

13  A   Acute drug toxicity or, I guess, accidental death by the

14  use of drugs.

15  Q   And any particular drug or narcotic that was listed in the

16  autopsy reports?

17  A   Yes.   They listed a analogue controlled narcotics that's

18  more commonly known as 25-I-NBOMe.

19  Q   Okay.   So, just so the court reporter has that, 25-I as in

20  igloo, N as in Nancy, B as in boy, O as in Oregon, M as in

21  man, and then little e as in elephant.

22  A   That's correct.

23  Q   Okay.   And so, with the death of those two individuals,

24  your office got involved and an investigation began; is that

25  correct?

1   A  That's correct.

2   Q  Not long after the death of those two individuals from that

3   particular chemical substance, did you -- were you approached

4   by a cooperator?

5   A  Yes.

6   Q  Who did that cooperator work for?

7   A  He worked with Charles Carlton and John Polinski at Motion

8   Resources in Houston, Texas.

9   Q  And what did he tell you about what Motion Resources -- is

10  that the name of the business, Motion Resources?

11  A  Motion Resources, LLC, I believe.

12  Q  And what did he -- what did the cooperator tell you about

13  what the nature of that business was?

14  A  He stated that the business was involved with the

15  procurement and distribution of research chemicals.

16  Q  And are those the types of substances we've been talking

17  about so far in your testimony?

18  A  Correct.

19  Q  And what did he tell you, if anything, about whether or not

20  those chemicals were being sold for human consumption?

21  A  He stated that Motion Resources would advertise that the

22  chemicals are sold for research and chemical purposes only,

23  but he stated that it was common knowledge among Charles

24  Carlton, John Polinski, himself that -- that they were being

25  sold and used by several customers throughout the United

1  States for human consumption.

2  Q  And who was this primary business partner?  I think you

3  mentioned it.  I just want to make it clear.

4  A  Charles Carlton.

5  Q  And you mentioned Mr. Polinski.  What, if anything, did the

6  cooperator tell you about Mr. Polinski's role at Motion

7  Resources?

8  A  He stated that Mr. Polinski was employed originally as,

9  like, the information technology or the computer guy.  That --

10  that was his words.  He stated that he was their web

11  administrator and kind of got their website up and running,

12  and he stated that Mr. Polinski would also assist in the

13  procurement of some of these chemicals, as well as, I guess,

14  packaging and labeling and making sure they're ready to be

15  sent off to people throughout the -- or I guess, their

16  customers.

17  Q  Did the cooperator mention anything in particular about any

18  names or individuals that related to the case you had going up

19  in North Dakota?

20  A  Yes.  He mentioned the name Andrew Spofford.

21  Q  And in what context, with respect to Mr. Carlton and Mr.

22  Polinski, did the name Andrew Spofford come up?

23  A  He stated that on one occasion while he was in the office

24  he overheard Charles Carlton speaking with Mr. Polinski about

25  a guy by the name of Andrew Spofford in North Dakota.

Grube - Direct                                          13

1   Q   And tell the Judge what significance that name, Andrew

2   Spofford, has to you and your investigation, as it relates to

3   this case.

4   A   Our investigation in North Dakota revealed that Andrew

5   Spofford was responsible for, I guess, the procurement and

6   distribution of a large majority of these analogue controlled

7   narcotics in the Grand Forks, North Dakota area.

8   Q   Okay.  And sticking with the cooperator from Motion

9   Resources, what if anything did he tell you about this

10  conversation that he overheard.

11  A   He stated that he -- he did hear them talking about Andrew

12  Spofford in North Dakota, and he became very curious at that

13  time.

14  Q   What, if anything, did he do at that time?

15  A   He stated that later on he did a -- an internet -- he -- he

16  went on to Mr. Carlton's computer that was in the office and

17  went through his -- like his internet history searches and

18  observed the name Andrew Spofford and some other stuff

19  associated to North Dakota.

20              He did research on those, I guess, URL addresses

21  that he -- that he looked at, and he noticed that Andrew

22  Spofford was arrested up in North Dakota.

23  Q   For what?

24  A   On drug -- drug charges.

25  Q   Okay.  And what, if anything else, did he do concerning

1   records or documents at Motion Resources?

2   A   I mean, he also noticed -- noted that -- that there was a

3   couple of kids that had died in North Dakota related to that.

4   So at that point in time he -- he stated that he -- he removed

5   four hard drives from the office and -- and the -- in an

6   effort to preserve evidence, he said, and he contacted an

7   attorney who reached out to -- to our Assistant United States

8   Attorney in North Dakota.

9   Q   Was the cooperator able to provide any information about

10  whether or not Mr. Spofford had purchased chemicals from

11  Motion Resources?

12  A   Yes.  Before he, I guess, left the business, the cooperator

13  stated that he did look through some of the shipping records

14  that Motion Resources kept in a -- in paper copy, and he did

15  observe that Andrew Spofford did, in fact, purchase some of

16  these research chemicals from Motion Resources.

17  Q   Okay.  Ultimately, was Mr. Spofford charged up in North

18  Dakota?

19  A   Yes.  He was indicted.

20  Q   Did you conduct any search warrants in connection with that

21  investigation?

22  A   Yes.  We did.

23  Q   What, if anything, of note was found when you conducted the

24  search related to Mr. Spofford?

25  A   We found a small amount of these analogue controlled

Grube - Direct                                                    15

1  Narcotics, more specifically, a small amount of this 25-I-

2  NBOMe; we found --

3  Q  And where was that located?

4  A  That was located in Mr. Spofford's residence.

5  Q  All right.  Did Mr. Spofford ultimately cooperate and agree

6  to interview with investigating agents?

7  A  Yes.  He did.

8  Q  And what, if anything, did he tell you about the source of

9  the 25-I-NBOMe or other substances similar to that?

10  A  Mr. Spofford stated that he learned about Motion Resources

11  through the legalhighguys and euphoricknowledge, I guess,

12  online chat rooms, and he stated at some point he reached out

13  to Motion Resources and began to purchase some of these

14  research chemicals from them.

15  Q  Did he provide you with any other information or documents

16  or packaging?

17  A  When agents executed a search warrant at the -- at Andrew

18  Spofford's residence they recovered a clear plastic bag which

19  the powder was contained in.  He -- he provided that.  He --

20  I'm not sure what else.

21  Q  Okay.  And that's fine.

22              After -- after Mr. Spofford's cooperation and

23  that search was run, did you ultimately have occasion to run

24  some searches down here in Houston?

25  A  Yes.

1   Q   And what are -- what locations -- just list them out for us

2   -- did you conduct searchers?

3   A   In August 2012, we conducted search warrants at Charles

4   Carlton's residence in Katy, Texas, Motion Resources business

5   office in the Houston, Texas area.  We also conducted a search

6   on a UPS store, known to be used by Charles Carlton and Motion

7   Resources.

8                   We conducted a search warrant on the four

9   computer hard drives that were provided to law enforce- -- law

10  enforcement by the cooperator, and we also provided the --

11  conducted a search warrant on an email company known as

12  wholeskater.com, and wholeskater.com was the email server for

13  the website motionresearchco.com that was known to be used by

14  Motion Resources --

15  Q   Okay.

16                  And we're going to talk about each of those

17  briefly, in order.

18                  Let's start with the business.

19                  What, in general, was found of note at the

20  Motion Resources business search?

21  A   During the search of the business we -- we found an

22  assortment of research chemicals.  We found banking

23  information.  We found international wire transfer information

24  --

25  Q   Okay.  Let's break this down.

Grube - Direct                                          17

1            With the chemicals you found, was the 25-I-NBOMe

2    one of the chemicals found at the business?

3    A   Yes.  It was.

4    Q   What about packaging?

5            Did you find any packaging that was significant

6    to your investigation?

7    A   Yes.  We -- we found a large amount of unused packaging

8    equipment, and then -- or packaging material, and then we

9    found a large amount of these clear plastic bags used to, what

10   appeared, package some of the research chemicals in smaller

11   quantities.

12   Q   And what significance, if any, did those have with what

13   you'd found from Mr. Spofford's home?

14   A   Those bags appeared to be the exact same as evidence that

15   we recovered from the crime scenes where the two kids died in

16   North Dakota, and -- or -- excuse me -- one kid died in North

17   Dakota; one kid died in Minnesota.

18   Q   Okay.

19            And what about invoices?

20            Did you find any invoices?

21   A   Yes.

22            We -- it appeared that Motion Resources kept a -

23   - a copy invoice of -- of each customer's purchase -- or a

24   majority of them, and we found several invoices that Motion

25   Resources -- where Motion Resources had sold research

1  chemicals to Andrew Spofford in Grand Forks, North Dakota.

2  Q  Okay.

3         You mentioned bank records.  What, if anything,

4  of significance did that show you with your investigation?

5  A  The bank records showed that Motion Resources was involved

6  in a large amount of international wire transfers with China

7  and several other countries.

8  Q  Okay.

9         Anything else of note found in the business that

10  you can recall sitting here right now?

11  A  Yes.  We found a black briefcase, and inside that black

12  briefcase there was an assortment of these research chemicals,

13  but there was also -- like a -- a journal, and in that journal

14  there appeared to be one handwritten, I guess, journal entry

15  and while reviewing that entry it appeared that -- that the

16  author of the -- the journal entry was documenting on one

17  occasion where that person and three others were -- were using

18  a chemical known as 4-ACODMT, and they were kind of talking

19  about the -- the -- the dosage amounts that they would use and

20  the effects that that chemical had on them.

21  Q  Okay.

22         And did your investigation reveal whose

23  handwriting that was?

24  A  Yes.   I provided -- provided documentation to the Grand

25  Forks Police Department, and they had a handwriting analysis

Grube - Direct                                    19

1  expert review the documents.  And the report that I received

2  from the Grand Forks Police Department confirmed that Charles

3  Carlton was the author of the journal entry.

4  Q  While -- were you physically present, at least, by the

5  conclusion of the search of the business at Motion Resources?

6  A  Yes.

7  Q  Did you encounter anybody sitting here in the courtroom

8  today at that search?

9  A  Yes.

10 Q  Who?

11 A  John Polinski.

12 Q  Can you identify him?

13 A  He's the man in the orange shirt with long hair sitting at

14 the defense table.

15        MR. VARNADO:  Let the record reflect that the agent

16 has identified the Defendant, Mr. Polinski.

17        THE COURT:  I'm not sure.

18            Are you contesting identity, Ms. Landau?

19        MS. LANDAU:  Yes.  We were going to do an identity

20 hearing, as well as I understood.

21        THE COURT:  All right.

22            Then, I won't.

23        MR. VARNADO:  Well, that's part of my identity proof.

24        THE COURT:  I understand that he pointed to Mr.

25 Polinski.

Grube - Direct                                                    20

1            MR. VARNADO:  Okay.

2            THE COURT:  Thank you.

3    BY MR. VARNADO:

4    Q  So, explain for the Court, when you encountered Mr.

5    Polinski, how was he first encountered by law enforcement at

6    that -- at that search?

7    A  I was not present when he was first encountered, but I was

8    told by law enforcement agents that they observed him either

9    in the building or in close proximity to the building where

10   Motion Resources leased office space, and they observed the

11   person at the time appeared to be attempting to flee the area

12   --

13   Q  Was he ultimately located?

14   A  Yes.  He was.

15   Q  Where was he found in relation to the Motion Resources

16   business?

17   A  He was found in a nearby strip mall locked in a bathroom.

18   Q  And did he ultimately agree to come out of that bathroom

19   and -- and speak with investigators?

20   A  Yes.  He did.

21   Q  Did he return to the scene?

22   A  Yes.

23   Q  And is that where you encountered him?

24   A  Yes.

25            I -- yes.  I spoke with him at the Motion

DIGITAL SCROLL TRANSCRIPTION                        281.996.7978

Grube - Direct                                          21

1   Resources office.

2   Q  And what, if anything, did he tell you when you were

3   speaking with him?

4   A  He told us that he was the IT guy for Motion Resources, LLC

5   and had been employed there for approximately six months.

6   Q  Did he say anything else that -- that is relevant to this

7   particular investigation vis a vis Mr. Carlton?

8   A  Yes.

9                I asked him what he knew about an investigation

10  that agents conducted in North Dakota, and he stated that on

11  one occasion Charles Carlton spoke with him about Andrew

12  Spofford and mentioned to him about the deaths in North

13  Dakota.  And he stated that Carlton informed him to pay

14  attention to the news on that situation.

15  Q  Okay.  And we talked about the search of the business.

16  You mentioned there was also a search of Mr. Carlton's home.

17                Can you tell us just in general, big picture

18  terms, what were the significant items located there?

19  A  We found a small amount of research chemical concealed in a

20  bag.

21  Q  And did that chemical have any relationship in terms of its

22  identity to chemicals purchased by Mr. Spofford?

23  A  Yes.

24                A lab analysis revealed that the chemical was

25  more commonly known as 4-HO-MET, which is one of the chemicals

DIGITAL SCROLL TRANSCRIPTION                            281.996.7978

1  that Mr. Spofford told us during the interview that he

2  purchased from Motion Resources.

3  Q  Okay.  What other significant items were located during the

4  search of Mr. Carlton's home?

5  A  We found a -- what appeared to be a customer list.

6                    It was on an Excel spreadsheet, and it had,

7  like, a large number of people's names; it had the markings

8  for some of these chemicals that -- or I guess the street name

9  for some of these chemicals.  It appeared to have, like, a

10 quantity or a -- yeah, quantity assigned to it, and some other

11 information.

12 Q  Did you do anything with respect to the names on that list?

13 A  Yeah.  We conducted a -- a search in one of our law

14 enforcement databases known as the -- as TECS, or the Treasury

15 Enforcement Communication System.

16 Q  Does that show things that have been seized by Customs?

17 A  Yes.  It does.

18 Q  What, if anything, did your search reveal?

19 A  The search of the customer list revealed that Mr.

20 Spofford's name and Mr. Polinski's name were on the list, in

21 addition to approximately fifteen others that had previous

22 seizures of controlled substances or analogue controlled

23 substances made by U.S. Customs and Border Protection

24 officials.

25 Q  Any other financial records or otherwise that were

1  significant in the search of Mr. Carlton's home?

2  A  Yeah.

3              We found, like, personal banking information, as

4  well as banking information related to Motion Resources, LLC.

5  Q  Anything about those -- that banking information that

6  related to your investigation as you saw it?

7  A  Yeah.  We found additional documentation which -- which led

8  us to believe that they used the accounts to procure some of

9  these research chemicals from outside the United States.  So,

10  it was, like, wire transfer details.

11  Q  Okay.  And after the search of Mr. Carlton's home, were you

12  and the Assistant United States Attorney assigned to the case

13  up in North Dakota contacted by Mr. Gaiser here, on behalf of

14  Mr. Carlton?

15  A  Mr. Myers was contacted by Charles Carlton's attorney.

16              I'm not sure if he told me if it was Mr. Gaiser,

17  but --

18  Q  Do you recall his first name?

19  A  Terry.

20  Q  Okay.

21              In addition to the -- the home and the business

22  search you mentioned a search of a P.O. Box.  What, if

23  anything, significant did you find in that search?

24  A  During the search of the P.O. Box, we found one piece of

25  mail that appeared to be kind of junk mail but we were also

1    provided with a large amount of documents related to the

2    receipt of -- of packages that were -- that were I guess

3    received at the -- at the UPS location related to their box

4    number.

5    Q  And how did that relate, if at all, to any information you

6    received from the Motion Resources cooperator about how that

7    P. O. Box was used?

8    A  Yeah.  The cooperator stated that -- that he knew Motion

9    Resources and Charles Carlton to receive some of these

10   analogue substances through the mail at that UPS P. O. Box.

11   Q  Okay.

12                   Now you mentioned there was search of some

13   computers.  Were those computers easily accessible or

14   something else?

15   A  The computers -- a search is still being conducted on the

16   computers as they were heavily encrypted, but we have been

17   able to obtain some of the documents off there and --

18   Q  What are the sort of documents that you've been able to

19   obtain from the computers taken from Motion Resources?

20   A  It appears to be, like, partial customer lists, as well as

21   some email documents.

22   Q  And you mentioned that you did a search on the hostgator

23   entity that housed the motionreserachco.com website; is that

24   correct?

25   A  Yes, sir.

Grube - Direct                                    25

1   Q   Did you find any emails in relating to that search warrant?

2   A   Yes.  We were provided with several thousand emails.

3   Q   And so what in general terms -- just tell the Court -- what

4   the types of communications that are relevant to this case.

5   A   There was a large amount of emails related to the

6   procurement and distribution of some of these substances.

7   Q   And those emails were generally authored or received by

8   whom?

9   A   It was either Charles Carlton, John Polinski or it was

10  noted as the MRC, which I believe to be the Motion Researches

11  -- Mot- -- Motion Resources Company Administrator.

12  Q   Okay.  And so, just give us a flavor for the types of folks

13  that are interacting with Mr. Carlton and Mr. Polinski on the

14  email.

15  A   It appeared that they were having an email conversation

16  with an internet -- excuse me -- a supplier from China or

17  other countries, as well as possibly some of the customers

18  that they were distributing some of these research chemicals

19  to.

20  Q   Now when Motion Resource, it sells these research chemicals

21  do they purport to have their customers fill out something

22  called a usage statement?

23  A   Yes, sir.

24  Q   And just in general terms, what are -- what are they

25  attempting to accomplish through the usage statement?

1  A  They're attempting to I guess sec- -- how would you say

2  that -- they're trying to make sure that their customers are

3  using the chemicals for research and chemical purposes only.

4  Q  As opposed to what?

5  A  For human consumption.

6  Q  Okay.  And based on your review of these emails, does that

7  usage statement and this -- that Motion Resources would have

8  people fill out something that was rigorously enforced or done

9  with a wink and a nod or use your own characterization?

10  A  It appears that as long as the usage statements said for --

11  or were along their lines of for chemical and research

12  purposes only they would approve them, but there were

13  occasions where the customer would maybe make a statement in

14  the research statement alleging that it may be used for a

15  different -- different purpose than for research and chemical

16  --

17  Q  Like --

18  A  -- purposes only.

19  Q  Like spiritual enlightenment?

20  A  Yes, sir.

21  Q  And so, what would they do with a customer who said they

22  wanted those chemicals for "spiritual enlightenment".

23  A  They would reject their application, but they would ask

24  them to reapply with a -- a different statement if -- if

25  they're going to change their mind, I guess.

1  Q   So ultimately, after running the searches in Houston, the

2  completion of the toxicology reports, obtaining some of the

3  documents from the emails and computers, were these

4  individuals ultimately indicted?

5  A   Yes.

6              They were indicted in December.

7  Q   And were they ultimately -- an arrest warrant issued for

8  their arrest?

9  A   Correct.

10 Q   Prior to their arrest, did you take any steps to run any

11 criminal history on -- based upon the identifiers that you

12 had?

13 A   Yes.

14 Q   Did you obtain that criminal history?

15 A   Yes, in addition to driver's license information and

16 photograph through -- through the State of Texas.

17 Q   Ultimately were both Defendants brought into custody this

18 week?

19 A   Yes.  They were.

20 Q   Were they fingerprinted after being arrested?

21 A   Yes.

22              The Houston agents --

23 Q   And --

24 A   -- did that.

25 Q   And after the Houston agents fingerprinted them, how did

1  that match with comparison to the criminal histories and

2  identifiers that you had discovered prior to their arrest?

3  A  Both subjects had been previously arrested on -- on related

4  crimes, so they're assigned a number in the FBI fingerprint

5  database.  So, when the Houston agents ran them after their

6  arrest on this occasion, their fingerprints matched to their

7  previous criminal record.

8  Q  And have you had occasion to review the Texas driver's

9  licenses associated with each of these two Defendants?

10  A  Yes.  I have.

11  Q  Do they match the two Defendants sitting at the table?

12  A  Yes, sir.

13  Q  Any doubt in your mind that this is John Polinski -- the

14  John Robert Polinski who's associated with Motion Resources

15  and one of the targets of your investigation?

16  A  No, sir.

17  Q  Any doubt in your mind that this is Charles William Carlton

18  and one of the subjects of your investigation into Motion

19  Resources, LLC?

20  A  No, sir.

21  Q  During the course of your investigation, have you

22  determined whether or not either Mr. Carlton or Mr. Polinski

23  has any family contacts in the North Dakota area that would

24  give the Court reason to believe that that would insure their

25  appearance at trial?

 1  A  No.  I don't believe they have contacts in North Dakota.

 2          MR. VARNADO:  I'll pass the witness, Your Honor.

 3          THE COURT:  All right.

 4              Mr. Gaiser?

 5          MR. GAISER:  Thank you, Your Honor.

 6                      CROSS EXAMINATION

 7  BY MR. GAISER:

 8  Q  Mr. Christopher Myers is the U.S. Attorney that is with the

 9  lead prosecutor in this investigation.  Is that correct?

10  A  Correct, sir.

11  Q  Did Mr. Myers inform you that I had offered to surrender

12  Mr. Carlton either here or in North Dakota?

13  A  I do not recall at this time.

14              We may have had that conversation, but I don't

15  recall.

16          MR. VARNADO:  And -- and, Your Honor, I'm sorry to

17  interrupt.

18              Mr. Gaiser, if you could use the microphone?

19  I'm having a little trouble.

20          MR. GAISER:  Oh, I'm sorry.

21          MR. VARNADO:  Just pull it closer.

22          THE COURT:  You may only help the court reporter.

23          MR. GAISER:  I want to help the court reporter.

24              Thank you.

25  BY                      MR.                      GAISWER:


DIGITAL SCROLL TRANSCRIPTION                          281.996.7978

Grube - Cross                                    30

1   Q    Special Agent, you refer to these as -- as research

2   chemicals.

3                  Is -- where did that term come from?

4                  How did that -- you derive that term?

5   A   It came from a number of cooperating people in the case.

6   They referred to the substances they were selling in the Grand

7   Forks area to as research chemicals.

8   Q   The -- these are a number of suspects in the Grand Forks

9   area?

10  A   Correct.

11  Q   All right.  And did all these subjects have dealings with

12  Motion Resources?

13  A   The suspects in North Dakota had dealings with Andrew

14  Spofford.

15  Q   Okay.  And is Andrew Spofford the only individual in North

16  Dakota that you know of that had dealings with Motion

17  Resources?

18  A   No, sir.

19  Q   There are others in North Dakota?

20  A   Yes, sir.

21  Q   Okay.  In Grand Forks?

22  A   Yes, sir.

23  Q   How many are we talking?

24  A   There's one other person indicted in this case that has --

25  had contact with Motion Resources in Grand Forks, North

DIGITAL SCROLL TRANSCRIPTION                          281.996.7978

1   Dakota.

2   Q   Okay.  When you refer to cooperator, you said cooperators.

3   So, there's more than one person that's cooperating?

4   A   In this overall investigation?

5   Q   Yes, sir.

6   A   Yes, sir.

7   Q   Okay.  And you indicated how these chemicals are ingested.

8                    How did you learn how they were ingested?

9   A   Through cooperating statements.

10  Q   These came from Mr. Spofford, I take it?

11  A   And several others.

12  Q   Now it's no secret as to who the cooperator at Motion

13  Resources is or was; is it?

14  A   No, sir.

15  Q   I mean, he -- you -- you claimed he worked there, correct?

16  A   Correct.

17  Q   Was he a partner in that business?

18  A   Yes.

19  Q   So, he wasn't just an employee?

20  A   No.

21  Q   He had an active role in -- in the management of -- and

22  everyday operations of Motion Resources, correct?

23           MR. VARNADO:  Your Honor -- and I'm sorry, Mr.

24  Gaiser, to cut you off.

25                    I do want to make sure that we don't just go

1   into some discovery expedition here.

2               I had to put on some amount of proof to explain

3   to the Court what this Indictment's about and obviously the

4   strength of the evidence is a factor in detention --

5           THE COURT:  Is that an objection?

6           MR. VARNADO:  -- but --

7           THE COURT:  Is that an objection?

8           MR. VARNADO:  There is an objection that I --

9           THE COURT:  And the objection is?

10          MR. VARNADO:  That this is beyond the scope and he's

11  just trying to engage in a discovery process.

12          THE COURT:  Well, I'll allow some of it but not too

13  long, Mr. Gaiser.  We have other matters to take up.

14          MR. GAISER:  Well, it certainly bears on what his

15  motives --

16          THE COURT:  I understand.

17          MR. GAISER:  -- for cooperating.

18          THE COURT:  Okay.

19              Go ahead.

20              Overruled.

21          MR. VARNADO:  Which I would say doesn't have any

22  relevance to the detention --

23          THE COURT:  The objection's overruled.

24          MR. VARNADO:  -- decision.

25          THE COURT:  Let's move on, gentlemen.

1  BY MR. GAISER:

2  Q   Is that a fact?

3  A   I'm sorry.  Could you repeat the question?

4  Q   Sure.

5              He had a role in the management and everyday

6  operation of Motion Resources?

7  A   That is what he told me.

8  Q   Okay.

9              Now, you also referred to our particular case

10  when you talked about how the thing -- how these chemicals are

11  ingested.

12             Was that derived from your witnesses up in North

13  Dakota as to how the chemicals were ingested?

14  A   I meant the -- that's how the people in our specific case,

15  the cooperators, that's how they stated they ingested the

16  chemicals.  I'm not certain if people throughout the United

17  States may take them in different manners.  So, I just meant

18  my area specifically.

19  Q   Now, Mr. Spofford took the hard drives from the computers

20  at Motion Resources?

21  A   That's not correct.

22             The cooperator.

23  Q   Oh, pardon me.

24             The cooperator took it; is that correct?

25  A   Correct.  That's what he informed us.

1    Q   And you in turn got a search warrant and examined the

2    contents of those hard drives?

3    A   We got a search warrant.  We've began the examination but

4    the forensic examination on the computer is not complete.

5    Q   Now, when you conducted a warrant -- or conducted a search,

6    rather, and seizure of -- of the business property of Motion

7    Resources you took all of the business documents with you,

8    correct, seized all of those business documents?

9    A   We seized the majority of the documents in the business but

10   not all of them.

11   Q   Okay.  What did you leave behind?

12   A   It -- when I arrived at the office, the search warrant had

13   been pretty much completed.

14                   There was a large amount of documents placed in

15   seizure bags.  There was some miscellaneous mail in other

16   documents that were around the office.  I didn't look at every

17   piece of -- or every document there.

18   Q   Well, were all the financial records seized?

19   A   I'm not sure if all the financial records were seized, but

20   we seized at least a portion of the records.

21   Q   Well, from your testimony, I assumed that you had a

22   detailed account of -- of all the dealings of this company,

23   Motion Resources.  Is that correct?

24   A   We've received a portion of the documents at the search

25   warrant, as well as we issued a grand jury subpoena for the

1   company documents.

2   Q  So, you have the invoices that they sent out or the -- the

3   -- and also the orders that came in for these chemicals?

4   A  We have a portion of the documents.  I think until the

5   forensic examination on all the computers is complete we won't

6   -- we won't know if we have all of them.

7   Q  Well, were there other computers seized from Motion

8   Resources --

9   A  Yes.

10  Q  -- other than the hard drives given to you by the

11  cooperator?

12  A  Yes, there was, sir.

13  Q  And how many of those?

14  A  At least four computers or computer hard drives.

15  Q  Now, in the Indictment, I noticed that the Indictment is

16  requesting the forfeiture of three hundred and eight-five

17  thousand dollars cash.

18                   Did you find a large amount of cash at Motion

19  Resources or at the home of Mr. Carlton?

20  A  No.  We did not.  That three hundred and eighty-five

21  thousand dollars is the amount that was deposited into Mr.

22  Carlton's -- excuse me -- deposited into Motion Resources, LLC

23  business account during the time frame of November 2011

24  through August 2012.

25  Q  And did you seize the bank accounts of Motion Resources and

1   Mr. Carlton?

2   A  Yes, we did.

3   Q  How much money was obtained in that venture?

4   A  I'm not certain of the exact dollar figure, but it was no

5   more than a few thousand dollars.

6   Q  So, the three hundred and eight-five thousand is the gross

7   receipts of that company, correct?

8   A  According to the information received, I believe so.

9   Q  Did that company sell anything besides these research

10  chemicals?

11  A  The cooperator stated that a small portion of their

12  business was laboratory supplies, like beakers or -- or

13  scales.  I'm -- I'm not exactly sure, but just small

14  laboratory supplies.  But until the forensic examination is

15  done of the computers, we won't know.

16  Q  Okay.  You stated that when the cooperator was in the

17  office of Motion Resources you overheard a conversation

18  between Mr. Polinski and Mr. Carlton.

19            What was that conversation?

20  A  The cooperator told us that he overheard Charles Carlton

21  tell Mr. Polinski -- or -- or mentioned the name Andrew

22  Spofford in North Dakota.

23            That's when he conducted his, I guess, internet

24  search of Carlton's computer.

25  Q  Is that when he conducted the -- you say he conducted an

1  internet search of Mr. Carlton's computer?

2  A  He -- he stated that he went onto Carlton's computer I

3  guess shortly after he heard the conversation, and he stated

4  that he went down to, like, his internet history, so I guess

5  your most recently visited websites.  And I guess he visited

6  those websites, and then that's where he learned about Andrew

7  Spofford's legal issues and some deaths in North Dakota.

8              That's what he told us.

9  Q  Okay.

10          MR. GAISER:  I'll pass the witness.

11          THE COURT:  All right.

12              Ms. Landau?

13                 CROSS EXAMINATION

14  BY MS. LANDAU:

15  Q  Good afternoon, Mr. Grube.

16  A  Good afternoon.

17      (Pause in proceedings.)

18  Q  Sorry about that.

19              So, you said that Mr. Polinski was the IT guy;

20  is that correct?

21  A  That's what a cooperator told us, and Mr. Polinski stated

22  that he was employed at Motion Resources, as kind of the IT

23  guy.

24  Q  Do you know the nature of his employment?

25  A  Meaning?

1   Q  Meaning, was he a contract employee?  Was he a full time

2   employee?

3   A  I'm not sure if he was a full time employee, but we did

4   recover, I guess, payroll documents during a search of the

5   office as well, and payroll documents revealed that Mr.

6   Polinski received in excess of ten thousand dollars in payment

7   during 2012.

8   Q  And he worked there for six months; is that correct?

9   A  That's just what he told us.

10           Payroll documents just revealed that he -- he

11  did get paid in excess of ten thousand dollars through 2012.

12  I'm not sure how long he worked there.

13  Q  Do you know the going rate for an IT guy?

14  A  No.  I do not.

15  Q  When you interviewed Mr. Polinski what -- he said that he

16  was the IT guy, he had worked there for six months.

17           What else did he tell you when you interviewed

18  him?

19  A  I'd have to review my report fully, but he did mention that

20  Charles Carlton did speak to him about Andrew Spofford in

21  North Dakota and asked him to keep up on the news related to

22  that situation up there related to our investigation.

23  Q  What was the date of that interview?

24  A  I believe August 24th, 2012.  That's the date we executed

25  the search warrant at the office.

1  Q   And it was this week that these Defendants were arrested?

2  A   Correct.

3  Q   So, they've known about the issue since the end of August?

4  A   What issue?

5  Q   The issue that's before the Court.

6              They've known that there was -- they've known

7  that Motion Resources was under investigation since that time,

8  correct?

9  A   Yeah.  I would say so.

10 Q   Did you search Mr. Polinski's home?

11 A   No.

12 Q   Why not?

13 A   The information we had at that time is that Charles Carlton

14 was possibly -- had evidence that we were looking for at his

15 residence and at Motion Resources office, as well as other

16 locations.  We didn't have, I guess, a large amount of

17 information about John Polinski's involvement at that time.

18 Q   So, in addition to being the IT guy, you indicated that Mr.

19 Polinski assisted in procurement, labeling and packaging.

20              Is that correct?

21 A   That is what a cooperator told us.

22 Q   What is the nature of -- does -- the cooperator's

23 statements about Mr. Polinski's role in procurement?

24 A   I don't believe the cooperator knew about procurement with

25 Mr. Polinski, but during a search of the email account held by

1  hostgator.com, we discovered several emails where John

2  Polinski authored email messages on behalf of Motion Resources

3  requesting prices, payment options.  I guess, in those email

4  messages, he was talking with suppliers from overseas and

5  trying to, basically, coordinate the shipments of these

6  research chemicals to Motion Resources.

7  Q  Who were the suppliers with whom he was corresponding?

8  A  There was one main supplier by the name of Alice.  She -- I

9  -- I don't know if that -- that's real name or just a name

10 that she used in the email messages, but in her messages she

11 appeared to represent a chemical supply company from China.

12 Q  The chemical supply company was it identified?

13 A  It was, but I don't recall the name at this time.

14 Q  And with respect to labeling and packaging, what

15 information did you have about Mr. Polinski's role in those

16 things?

17 A  The cooperator stated just that, that he was involved in

18 the labeling and packaging of some of the materials.

19 Q  Some of which materials?

20 A  Some of the -- some of the materials or substances sold by

21 Motion Resources.

22             That's what he was inferring at the time he told

23 us the statement or talking about when -- when he talked with

24 us about John Polinski's role.

25 Q  Did you have any other information about Mr. Polinski's

1  role at Motion Resources?

2  A  During a search of the office, we also recovered an

3  international wire transfer, I believe, in the form of

4  MoneyGram or it could have been Western Union, but that was --

5  it was documents that showed that John Polinski's name and his

6  home address -- they -- where he had sent nine hundred dollars

7  to -- to a place overseas.

8  Q  To who?

9  A  Agents actually recovered an email, I guess, message -- or

10 an email string where John was speaking with somebody that we

11 believe to be an online supplier or a supplier, which

12 corroborated the wire transfer for nine hundred dollars.

13 Q  To whom was the wire transfer made?

14 A  It was made to someone overseas.  I'd have to look at the

15 documents to tell you the -- the exact name.  I don't

16 remember.

17 Q  Was it a person's name, or was it a company's name?

18 A  The email message stated that it appeared to be related to

19 a company by the name of Alpha Research Company, but in the

20 email message they had asked the person representing Motion

21 Resources to send the money to a different name.  It appeared

22 at a different location.

23             That name that was in that email message was the

24 person that was on the hard copy of the wire transfer receipt,

25 and it was a person's name.  I just -- I don't remember the

1  name right now.

2  Q  Can you explain a little further about what research

3  chemicals are?

4                I'm not familiar with that -- with that term.

5            MR. VARNADO:  Your Honor, I'd just object, as it's

6  been asked and answered, and it's also immaterial to the

7  subject of detention.

8            THE COURT:  Well, he can briefly state --

9                Briefly, briefly, Mr. Grube.

10           THE WITNESS:  Okay.

11               I guess customers or some other people in the

12 United States and internationally may refer to some of these

13 substances or -- as research chemicals, but in my mind they're

14 analogue controlled narcotics which are substantially similar

15 and pharmacologically similar to -- to Controlled Schedule 1

16 narcotics.

17 Q  You had said earlier that it -- that your cooperator told

18 you that it was common knowledge that these research chemicals

19 were used for human consumption?

20 A  That's correct.

21 Q  Common knowledge among whom?

22 A  The cooperator stated that Mr. Carlton, Mr. Polinski, and

23 himself knew that the products were being used for human

24 consumption, although they operated the business on the

25 preface that it was for research and chemical purposes only,

1   and there is -- the cooperators that we spoke to in the

2   investigation that have -- have been on some of these online

3   chats, like at legalhighguides or euphoricknowledge, say that

4   it's common knowledge among the people that are on these

5   websites that it's used for human consumption.

6                   I'll pass -- oh.

7                   Okay.  I have one more question.

8   Q   When did the cooperator leave Motion Resources?

9   A   In August of 2012.

10                  That's what he told us.

11          MS. LANDAU:  Thank you.

12                  I'll pass the witness.

13          THE COURT:  Any argument on identification, Mr.

14  Gaiser?

15          MR. GAISER:  No, Your Honor.

16          THE COURT:  Any argument on identification, Ms.

17  Landau?

18          MS. LANDAU:  No, Your Honor.

19          THE COURT:  All right.

20                  Charles William Carlton and John Robert

21  Polinski, I find that you are the individuals named in the

22  Indictment pending in the Southeastern Division of the

23  District of North Dakota, in the Cause Number there of 12-119.

24                  Is there any further information needed to

25  elicit from Mr. Grube on the question of pretrial detention,

1   Mr. Varnado?

2          MR. VARNADO:  Your Honor, just very briefly.

3          THE COURT:  All right.

4                   REDIRECT EXAMINATION

5   BY MR. VARNADO:

6   Q  With respect to those questions you got about the chat

7   rooms, Agent Grube, did your investigation reveal whether Mr.

8   Carlton has a presence on those different chat rooms, whether

9   he maintains a presence there?

10  A  Yes, sir.

11  Q  How about the company Motion Resources?

12  A  Yes, sir.

13  Q  In what form does Motion Resources maintain a presence?

14  A  We've been told by cooperators that they advertise on a few

15  of these online chat rooms.

16  Q  The chat rooms that discuss the individual and personal

17  consumption of these resource -- research chemicals, correct?

18  A  Correct.

19  Q  Okay.

20          MR. VARNADO:  Pass the Witness, Your Honor.

21          THE COURT:  Well, I have a question.

22                   EXAMINATION

23  BY THE COURT:

24  Q  This Motions in Research (sic) or whatever, it's no longer

25  operating, right?

1  A  I'm not certain, but we recovered documents where it shows

2  that they may have changed a company name shortly after we --

3  or in August 2012.

4  Q  Okay.  Tell me about that.

5  A  I don't remember the exact name, but it appears that

6  shortly after the cooperator came forward with some

7  information that -- that Mr. Carlton originated paperwork with

8  the State of Texas, among other entities, to start up a new

9  business.

10  Q  But do you know if that business started up?

11  A  It appears that he originated the paperwork.

12              I'm not sure if it's -- if it went up and

13  running.

14  Q  Do you have any knowledge of any distribution of these

15  substances since August of 2012?

16  A  No.  I do not.

17  Q  All right.

18              And do you have any information about -- what is

19  it, Motions -- being on these chat lines or websites or

20  anything since August of 2012?

21  A  No.  I don't.

22          THE COURT:  All right.

23              Anything further on detention from Ms. --

24  Special Agent --

25          MR. VARNADO:  No further questions for the witness,

1  Your Honor.

2          THE COURT:  All right.

3              Then, you may step down.

4          THE WITNESS:  Thank you.

5          THE COURT:  I take it you rest, Mr. Varnado?

6          MR. VARNADO:  Yes, Your Honor.

7          THE COURT:  Mr. Gaiser, any witnesses or proffers?

8          MR. GAISER:  On the issue of detention?

9          THE COURT:  Yes.

10         MR. GAISER:  I guess proffer is the only issue in

11 detention, Your Honor.

12         THE COURT:  All right.

13         MR. GAISER:  In the courtroom today are Mr. Carlton's

14 wife, who would testify in accord with the statements made in

15 the presentence report, that they're buying their own home and

16 have been living there for six years.  They have two children

17 ages five and one, that they both work, that Mr. Carlton is no

18 longer involved with Motion Resources or any other such

19 business, that he's working for another company; that Mr.

20 Bradley Smith, his stepfather, is here and is also a coworker

21 of his that would testify the same facts, that he works every

22 day, that he's a hard --

23         THE COURT:  Tell me about this employment.  What is

24 his employment?

25         MR. GAISER:  Mr. Smith, what is he doing?

1              MR. SMITH:  He works on X-ray equipment for -- for

2    hospitals and -- and private practices.

3              THE COURT:  And this is a full time job?

4              MR. SMITH:  Yes.  It is.

5              THE COURT:  All right.

6                   Thank you, Mr. Smith.

7              MR. GAISER:  Judge, he had worked there before he

8    started with Motion Resources business and went back to work

9    for them as soon as Motion Resources was closed.

10                  His mother is here --

11             THE COURT:  Can you hear?

12             MR. VARNADO:  I'm having a hard time hearing --

13             MR. GAISER:  I'm sorry.

14             MR. VARNADO:  -- and I would like to inquire about

15   this -- the x-ray equipment company that's -- he told Pretrial

16   he's worked there for eight years.

17                  I'm not -- I'm very curious about the employment

18   history.

19             THE COURT:  Mr. Smith, come take the stand.

20                  Raise your right hand to be sworn, please.

21             COURT CLERK:  Please raise your right hand, please.

22        (Witness sworn.)

23        BRADLEY SMITH, DEFENDANT CARLON'S WITNESS, SWORN

24                       DIRECT EXAMINATION

25   BY MR. GAISER:

Smith - Direct/Examination by Court                    48

1  Q   Mr. Smith -- your name is Bradley Smith, correct?

2  A   Correct.

3  Q   And you're Mr. Carlton's stepfather?

4  A   Correct.

5  Q   And you work with him?

6  A   Every day.

7  Q   Where do you work?

8  A   It's a -- a office out of Stafford, Texas.  It's an X-ray

9  equipment company.

10 Q   And how long have you worked there?

11 A   Probably about three years now.

12 Q   Now, Mr. Carlton has a recent employment there, correct?

13 A   Yes.

14 Q   How long has he worked there recently -- most recently?

15 A   Since probably August.

16 Q   And prior to that time, was he also employed at the same

17 company for some period of time?

18 A   Before he did the Motion Resources he was employed at X-Ray

19 Equipment.

20 Q   Do you know how long he was employed there before he

21 started?

22 A   A couple -- a couple of years.

23 Q   Thank you.

24                         EXAMINATION

25 BY THE COURT:

Smith - Examination by Court                              49

1  Q  Do you have any supervisory position over Mr. Carlton?

2  A  No.  We're pretty much --

3  Q  Does he have any supervisory position over you?

4  A  No.

5  Q  Who's the boss?

6  A  Randy Freeman.

7  Q  Will Mr. Freeman take Mr. Carlton back?

8  A  Yes.  He -- he will.

9  Q  And this is full time employment -- seven -- six -- five or

10 six days a week?

11 A  Yeah.  It's Monday through Friday, yes.

12 Q  And what do you do exactly, or what does he do exactly?

13 A  We repair doctor's X-ray equipment and digital equipment

14 for taking X-rays.

15         THE COURT:  Anything further from this witness, Mr.

16 Varnado?

17         MR. VARNADO:  Yes, Your Honor.

18         THE COURT:  Okay.

19                    CROSS EXAMINATION

20 BY MR. VARNADO:

21 Q  Mr. Smith, good afternoon.

22         When was it -- you said Mr. Carlton most

23 recently was employed at X-ray Equipment Company, in August of

24 this year; is that correct?

25 A  It was pretty much after the raid on his house.

1  Q  After the search warrant?

2  A  After the search warrants and everything, yes.

3  Q  Okay.  And so, for what period of time prior to then had he

4  not been working for X-ray Equipment Company?

5  A  It -- it wasn't very long; maybe six months.  You know, it

6  was -- he was work -- he -- when he stopped working for X-ray

7  that's when he opened up his business.

8  Q  He started his own business --

9  A  Right.

10  Q  -- and that's Motion Resources, LLC?

11  A  Right.

12  Q  Okay.  And then, you said that prior to him starting his

13  own business, the Motion Resources, he had worked for X-ray

14  Equipment Company for a couple of years.  Is that what you

15  said?

16  A  I believe so, yes.

17  Q  Okay.  And have you been working there that same amount of

18  time?

19  A  No.

20          I -- I came in later, and I worked for the last

21  couple of years, so.

22  Q  Okay.  So -- but he had not been working there for eight

23  years.  Is that fair to say?

24  A  I think he's been there a pretty good time -- a pretty good

25  long time before he started his own company.

1  Q  But I thought you just said it was a couple of years.

2  A  I'm -- I'm not sure on the exact date when he started.

3  Q  So, it could be two or it could be eight?

4  A  I'm not sure on the exact date when he started.

5            I -- I really can't tell you.

6  Q  And so, you certainly can't verify that he's been there

7  eight years?

8  A  It could be eight years.  I -- I could be mistaken on that,

9  but it could be eight years.

10  Q  And do you know how much he makes a year?

11  A  No.  I do not.

12  Q  And have you talked with Mr. Freeman directly about his

13  return to --

14  A  Yes.

15  Q  -- X-ray Equipment Company?

16  A  Yes.

17  Q  Do you know if Mr. Freeman's aware of the nature of these

18  charges he's facing?

19  A  I believe so.  I believe one of your agents had contacted

20  him about it.

21  Q  Okay.

22          MR. VARNADO:  No further questions, Your Honor.

23          THE COURT:  Anything further?

24          MR. GAISER:  No, Your Honor.

25          THE COURT:  Do you have a question?

1            MS. LANDAU:  Yes.  I do, Your Honor.

2                          CROSS EXAMINATION

3   BY MS. LANDAU:

4   Q  Does Mr. Polinski work for X-ray Equipment Company?

5   A  From what I understand it he's just a sub-contracting here

6   in the last couple months.

7            MS. LANDAU:  Thank you.

8            THE COURT:  All right.

9                  You can step down, Mr. Smith.

10                 Thank you.

11           THE COURT:  Any other witnesses or a continuation of

12  your proffer, Mr. Gaiser?

13           MR. GAISER:  We'd proffer the testimony of his

14  mother, who sees Mr. Carlton every day, cares for their

15  children at their home while both parents are at work, and

16  has, of course, known Mr. Carlton all of his life.

17                 The testimony of his sister, who sees him on a

18  frequent basis, she lives her in town also.

19                 And all of these family members would be willing

20  to co-sign on -- on a bond for him.

21                 His father is also here -- his biological father

22  is also here and likewise would be willing to co-sign on bond

23  for Mr. Carlton.

24           THE COURT:  Anything else, Mr. Gaiser?

25           MR. GAISER:  Not at this time, Judge.

```
 1              THE COURT:  All right.
 2                 Ms. Landau, any witnesses?
 3          MS. LANDAU:  No, Your Honor.  Just a proffer.
 4              THE COURT:  All right.
 5          MS. LANDAU:  The sister of Polinski's ex-spouse,
 6  Bonnie Maranga (phonetics), she's actually speaking with
 7  Pretrial Services right now, but I -- she is able to
 8  corroborate the information in the Pretrial Services Report.
 9                 Her parents, Paul and Jennifer Garcia, are
10  willing to take responsibility for Mr. Polinski.
11                 His mother is available to post bond.  She does
12  not live in the area.  She lives in Tucson, Arizona, but my
13  understating is that she has been in contact with the Pretrial
14  Services Office to pursue that.
15          THE COURT:  And what's her name?
16          MS. LANDAU:  Oh, Loraine Merrick (phonetics).
17          THE COURT:  And are you saying that the Garcias are
18  going to act as custodians?
19          MS. LANDAU:  Yes, Your Honor.
20          THE COURT:  Has anybody spoken with the Garcia's?
21          MS. MORENO:  If I understood correctly, the Garcias
22  are the --
23          THE COURT:  Ex-in laws.
24          MS. MORENO:  No.  No one has spoken -- that is not
25  who she proposed to our office.  She purposed her husband's --
```

1  her current husband, who -- that's who she proposed as a

2  surety.

3          We don't know anything about the Garcias.

4          MS. LANDAU:  My understanding is that her husband is

5  -- she is available, as well as her parents.  I just spoke to

6  her prior to this hearing.

7          THE COURT:  Okay.

8          Any argument, Mr. Varnado?

9          MR. VARNADO:  Your Honor, I'll just argue that under

10 3142(e)(3) this is a presumption case, that there are no

11 condition or a combination of conditions that will assure the

12 appearance of the Defendants at trial or the safety of the

13 public, and there's obviously probable cause to believe that

14 they committed the offenses in the Indictment, because the

15 grand jury has so found.

16          So, we do renew our urging that the Defendants

17 be detained pending trial based on the danger to the community

18 and as well as flight.

19          The Defendants have no contacts with North

20 Dakota, whatsoever, which is the operative district in

21 determining where they have contacts and whether they're

22 likely to appear.

23          They're obviously -- Mr. Polinski actually did

24 flee in -- on one occasion when law enforcement approached the

25 business.

1          In looking at the 3142(g) factors of detention,
2  if you look at the nature and circumstances of the offense,
3  here, we have Defendants who are facing anywhere from twenty
4  years to life in prison.  You have individuals, who actually
5  died as a result of this narcotics conspiracy.
6          It's a very serious charge, and that weighs
7  heavily against releasing them.
8          When you look at the weight of the evidence,
9  Agent Grube talked about the emails, the substances -- the
10  substances, themselves, bank records, communications.  There's
11  an enormous weight of evidence tying these Defendants to this
12  conspiracy and even to the -- to the deaths of these two young
13  individuals who took this narcotic.
14          Both Defendants have a prior criminal history.
15          Mr. Carlton actually has an aggravated assault
16  with a deadly weapon charge and that was pled down to
17  attempted deadly conduct.
18          That certainly weighs against his argument for,
19  you know, danger -- danger to the community.
20          Mr. Polinski has a possession of a controlled
21  substance offense, a theft defense; both Defendants have
22  admitted narcotic use.
23          There's actually contradictions in Mr. Carlton's
24  Pretrial -- Pretrial Services Report, where he reported no
25  other illegal drug use besides marijuana, and his wife

1   reported that he uses ecstasy, or has at least within, you

2   know, some number of years ago.

3            It's a -- it's a troubling case.  It's a case

4   from outside of this district.

5            We would argue that the combination of factors

6   would require these Defendants to remain in custody and that

7   they should be sent in the custody of the Marshal's Service to

8   North Dakota to stand trial.

9            THE COURT:  Thank you, Mr. Varnado.

10           Mr. Gaiser?

11           MR. GAISER:  Your Honor, the only risk of flight as

12   to Mr. Carlton is the fact that North Dakota is so far away

13   and so cold.

14           The -- the -- at one time Mr. Carlton offered to

15   surrender himself in North Dakota to -- I made that offer to

16   Mr. Myers.  I've never heard back from after that offer, other

17   than to find my client had been arrested earlier this week.

18           It would be that the circumstances of the

19   offense is testified to by the agents certainly are grave,

20   however, that company is no longer in business.  Mr. Carlton

21   is no longer involved in any of that activity, and -- and it's

22   equally as likely that the co-conspirator cooperator was

23   deeply involved in this matter at the same time that Mr.

24   Carlton is alleged to have been wrong.

25           This is not a crime of violence, although it's a

1   controlled substance case.

2            We believe that there are conditions that the

3   Court can impose that will assure that Mr. Carlton will not be

4   a threat to the community or be a risk of flight.

5            THE COURT:  All right.

6            Thank you, Mr. Gaiser.

7            Ms. Landau?

8        MS. LANDAU:  Just briefly, Your Honor.

9            Mr. Polinski has any number of friends, who

10  would attest to his character.

11           He does have ties to this community that have

12  gone back quite a ways, including his ex-spouse and her

13  family.

14           I -- I think it's important that -- to note that

15  Mr. Polinski's prior offenses were -- the total of them netted

16  him less than ten days in jail.

17           He does not have a significant criminal history

18  at all, and the offenses are non-violent, as is this one.

19           He -- he -- his role in the offense should also

20  be noted as the IT guy of the operation and that he is not a

21  risk of flight.  He has known about this situation since

22  August 21st, and he has stayed put.

23           So, he's not a risk of flight --

24           THE COURT:  All right.

25           MS. LANDAU:  -- and he's willing to wear an ankle

1  monitor, if that would --

2           THE COURT:  Thank you, Ms. Landau.

3           Gentlemen, Mr. Varnado is correct.  I have to

4  take into account not only the nature and circumstances of the

5  offense but also the weight of the evidence against you in

6  weighing whether the statutory presumptions as to risk of

7  flight or danger have been rebutted.  I also need to take into

8  account your own personal history and characteristics.

9           I find that the statutory presumption as to

10 danger has not been proven by clear and convincing evidence.

11          The statutory presumption as to risk of flight

12 can be rebutted by -- has been rebutted and can be addressed

13 by appropriate conditions of release.

14          I'm going to release you on a hundred thousand

15 dollar bond.  Ten percent must be deposited to the registry of

16 the Court before you can gain your release.

17          Mr. Carlton, your bond is to be co-signed by

18 your stepfather, Mr. Bradley Smith.  You are to maintain your

19 employment at that X-ray laboratory.  Your employment will be

20 monitored by the Pretrial Services Agency.  Your conduct will

21 be monitored by the Pretrial Services Agency while this case

22 is being prepared for trial.

23          You are not to commit -- and Mr. Polinski, this

24 applies to you as well.

25          You're not to commit any violation of local,

1 state or federal law.  You're not to do anything that would be

2 seen as an attempt to interfere with the Government's

3 investigation or to tamper with evidence or to get back at

4 anyone for giving information to the Government.

5            If you did those things, your bond could be

6 revoked, and you'll sit in jail.

7            You would also be looking at punishment for

8 other crimes that carry with them different ranges of

9 punishment.

10            While you're on conditions of release in this

11 case, you're to make all court appearances in connection with

12 the case.

13            Your first court appearance will be on January

14 10th, 2013, at ten o'clock in the morning in the Southeast -- I

15 guess, that's Grand Forks, Mr. Grube?

16        MR. GRUBE:  It's in Fargo, North Dakota.

17        THE COURT:  In Fargo, North Dakota.

18            While you're on conditions of release in this

19 case, you're not to have any contact with any persons

20 connected with this Indictment.

21            You're not to have any contact with each other.

22            Mr. Polinski, you're not going to be working at

23 that X-ray labs company.

24            You need to find a verifiable job within ten

25 working days.  I'm giving you ten days because of the holiday

1  that's intervening.

2           You must have full time employment with a boss.

3  You're not going to be a website designer.

4           You need to punch a clock, and if you're

5  wrapping hamburgers or you're shoveling snow you're going to

6  have a full time job.

7           Do you understand that?

8           DEFENDANT POLINSKI:  Yes, ma'am.

9           THE COURT:  While you're on conditions of release,

10 I'm going to have each of you placed on electronic monitoring.

11          Pretrial Services Agency can select the method

12 that's appropriate to each of you.

13          That will imply a curfew that you will have to

14 work out with your Pretrial Services Officer.

15          While you're on conditions of release in this

16 case, you're to have no weapons.

17          Do you have any weapons, Mr. Polinski?

18          DEFENDANT POLINSKI:  No, ma'am.

19          THE COURT:  Your bond is to be co-signed by your

20 mother, in Tucson, Arizona.  She can go to the courthouse

21 there to co-sign on the bond.

22          I want to get some information about the Garcias

23 to see if they're appropriate as custodians or sureties in

24 this matter, as well.

25          Mr. Polinski, you've been living at that address

DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

1    on Calmlassie (phonetics) for three years?

2              What's your rent there?

3              Do you have a lease?

4              DEFENDANT POLINSKI:  No.  I don't.  That's their --

5    it's the Garcias address.

6              THE COURT:  It's the Garcias address?

7                So, you've been living with the Garcias?

8              DEFENDANT POLINSKI:  Yes.

9              THE COURT:  Then, you need to stay living with the

10   Garcias.

11             DEFENDANT POLINSKI:  Yes, ma'am.

12             THE COURT:  Who else lives in that household?

13             DEFENDANT POLINSKI:  Just them and no one else.

14             THE COURT:  Well, who else has lived in the

15   household?

16             DEFENDANT POLINSKI:  Just -- just the Garcia family -

17   - I mean, Paul Garcia, Jennifer Garcia; at one point their

18   daughter and -- and some other son-in-law were living there at

19   one point, but no longer --

20             THE COURT:  But now, it's just you and the Garcias?

21             DEFENDANT POLINSKI:  Right.

22             THE COURT:  So, Mr. and Mrs. Paul Garcia are going to

23   be third party custodians.

24                That means you have to follow all the rules at

25   their residence --

1          DEFENDANT POLINSKI:  Right.

2          THE COURT:  As well as all the instructions I'm

3    giving you here this morning.

4              Do you understand that?

5          DEFENDANT POLINSKI:  Yes, ma'am.

6          THE COURT:  Each of you are going to submit to urine

7    samples on a random basis so I can determine whether you need

8    drug or alcohol treatment.

9              That sampling will begin when you're released

10   from custody so we'll have a base line and you won't be

11   accused of violating the conditions of release, if there's

12   something left in your bloodstream from before the time you

13   were placed on these conditions of release.

14             If the Pretrial Services Officer believes that

15   either of you are in need of drug or alcohol treatment, I'm

16   ordering you to enter that treatment program, to cooperate in

17   that treatment until you're discharged by the program

18   director, hopefully satisfactorily from the program.

19             While you're on conditions of release in this

20   case, you're to have no weapons, no firearms, no switchblades,

21   no shotguns.

22             Do you have anything like that, Mr. Polinski, in

23   your home?

24         DEFENDANT POLINSKI:  No.

25         THE COURT:  Do the Garcias have anything like that in

1  their home?

2          DEFENDANT POLINSKI:  No, I do not believe so.

3          THE COURT:  Mr. Carlton, you need to get all the

4  weapons out of your house before you're released from custody.

5              Do you understand that?

6          DEFENDANT CARLTON:  Yes, Your Honor.

7          THE COURT:  You are to have absolutely no contact

8  with overseas businesses or any businesses engaged in selling

9  research chemicals or analogue substances.

10             Do you understand that, Mr. Carlton?

11         DEFENDANT CARLTON:  Yes, Your Honor.

12         THE COURT:  Do you understand that, Mr. Polinski?

13         DEFENDANT POLINSKI: Yes, ma'am.

14         THE COURT:  Mr. Polinski, I don't want you working at

15 the X-ray lab job, because I don't want you to have any

16 contact with your co-Defendant while this case is being

17 prepared for trial.

18             You don't have any reason to have contact with

19 Mr. Carlton other than employment; do you?

20         DEFENDANT POLINSKI:  No, ma'am.

21         THE COURT:  All right.

22             You're not to get a passport while the case is

23 being prepared for trial, because your travel is going to be

24 restricted to Harris and the surrounding counties, unless you

25 were going -- excuse me -- to Fargo to face a hearing in

DIGITAL SCROLL TRANSCRIPTION                      281.996.7978

1    regard to these charges.

2                    Anything further, Ms. Moreno, as to Mr. Polinski

3    or Mr. Carlton?

4            MS. MORENO:  No, ma'am.

5            THE COURT:  Any questions, Mr. Carlton?

6            DEFENDANT CARLTON:  What was the date of the first

7    hearing in Fargo?

8            THE COURT:  January 10th.

9                    Okay.  Any questions, Mr. Polinski?

10                   You each need to sign and swear to these

11   conditions of release.  The bonds must be executed and the

12   sureties obtained before you're released from custody.

13                   Anything further, Ms. Landau?

14           MS. LANDAU:  No, Your Honor.

15           THE COURT:  Anything further, Mr. Gaiser?

16           MR. GAISER:  No, Your Honor.

17           THE COURT:  All right.

18           MR. VARNADO:  Your Honor, I do have something

19   further.

20           THE COURT:  Sure.

21           MR. VARNADO:  I'm going to ask that you stay your

22   order --

23           THE COURT:  I won't stay my order.

24                   You can ask the judge in North Dakota to stay

25   your order -- to stay the order, because any appeal is there.

1          MR. VARNADO:  Very well.

2          THE COURT:  All right.

3       (Proceedings concluded at 4:14 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4

5       I, Linda Griffin, court approved transcriber, certify that

6  the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10  /s/ Linda Griffin                        January 14, 2013
    Linda Griffin                                   Date
11  Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25