IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:12-cr-119-01 |
| Plaintiff, | |
| | PLEA AGREEMENT |
| v. | |
| CHARLES WILLIAM CARLTON, | |
| Defendant. | |

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America, by its attorneys, Timothy Q. Purdon, United States Attorney for the District of North Dakota, and Christopher C. Myers, Assistant United States Attorney, defendant, CHARLES WILLIAM CARLTON, and defendant's attorney, Alexander Reichert, agree to the following:

1.      Defendant acknowledges the Indictment in this case charges violations of Title 21, United States Code, Sections 331(a), 333(a)(1), 352, 812, 813, 841(a)(1), 841(b)(1)(C), 846, 853, 952(a), 960(b)(3), and 963; and Title 18, United States Code, Sections 371 and 2, and acknowledges the Information in this case charges a violation of Title 18, United States Code, Section 1956.

2.      Defendant has read the charges and defendant's attorney has fully explained the charges to defendant.

3.      Defendant fully understands the nature and elements of the charged crimes.

4.      Defendant will voluntarily plead guilty to Counts One and Three of the Indictment, and admit to the Forfeiture Allegation.  The Defendant will also plead guilty to the Information.

5.      The parties agree this Plea Agreement shall be filed as part of the Court record and be governed by Federal Rule of Criminal Procedure 11(c).  The parties specifically agree that Rule 11(c)(1)(C) does not apply.  If the United States makes the non-binding recommendations specified in this Plea Agreement, then defendant acknowledges that this agreement will have been fulfilled.  Except as provided in Rule 11(c)(5), the Court's refusal to accept any or all terms of the Plea Agreement does not give defendant a right to withdraw defendant's guilty plea.

6.      Defendant will plead guilty because defendant is in fact guilty of the charge. In pleading guilty to the Indictment, defendant acknowledges that as to Count One:

From in or about January 2011 through August 2012, in the Districts of North Dakota, Minnesota, Mississippi, Southern District of Texas, and elsewhere,

CHARLES WILLIAM CARLTON;
JOHN ROBERT POLINSKI;
BYRON JOSEPH LANDRY, a/k/a TRIPLESCREW; and
RYAN BURTON LANE

did knowingly and intentionally combine, conspire, confederate, and agree together with Andrew Michael Spofford, et al., currently indicted in the District of North Dakota, Southeastern Division, Case No. 3:12-cr-80, and others, both known and unknown to the grand jury, to possess with intent to distribute and distribute the following controlled

2

substance analogues, as defined in 21 U.S.C. § 802(32), knowing the substances were intended for human consumption as provided in 21 U.S.C. § 813:

1.  N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, a controlled substance analogue of 2,5-Dimethoxy-4-bromophenethylamine, also known as 2C-B, a Schedule I controlled substance;

2.  4-Chloro-2,5-dimethoxy-amphetamine, also known as DOC, a controlled substance analogue of 2,5-Dimethoxy-4-methyl-amphetamine, also known as DOM, a Schedule I controlled substance;

3.  2-(Ethylamino)-2-(3-methoxyphenyl)cyclohexanone, also known as MXE or Methoxetamine, a controlled substance analogue of N-ethyl-1-phenylcyclohexylamine, also known as 3-Eticyclidine or PCE, a Schedule I controlled substance;

4.  6-(2-Aminopropyl)-2,3-dihydrobenzofuran, also known as 6-APDB, a controlled substance analogue of MDA (3,4-methylenedioxy-amphetamine), a Schedule I controlled substance;

5.  1-(1-Benzofuran-6-yl)propan-2-amine, also known as 6-APB, a controlled substance analogue of MDA (3,4-methylenedioxy-amphetamine), a Schedule I controlled substance;

6. 4-Acetoxy-N, N-dimethyltryptamine, also known as 4-AcO-DMT, a controlled substance analogue of Psilocyn (4-hydroxy-N,N-dimethytriptamine), a Schedule I controlled substance;

7. 4-Fluoro-amphetamine, also known as 4-FA, a controlled substance analogue of amphetamine, a Schedule II controlled substance;

8. 4-Fluoro-methamphetamine, also known as 4-FMA, a controlled substance analogue of methamphetamine, a Schedule II controlled substance;

9. 2-Fluoro-amphetamine, also known as 2-FA, a controlled substance analogue of amphetamine, a Schedule II controlled substance;

10. 2-Fluoro-methamphetamine, also known as 2-FMA, a controlled substance analogue of methamphetamine, a Schedule II controlled substance;

11. 5-Methoxy-N,N-diallytryptamine, also known as 5-MeO-DALT, a controlled substance analogue of 5-Methoxy-N,N-diisopropyltryptamine (5-MeO-DiPT), a Schedule I controlled substance;

12. N-(2-methoxybenzyl)-4-chloro-2,5-dimethoxyphenethylamine, also known as 2C-C-NBOMe or 25C-NBOMe, a controlled substance analogue of 2,5-Dimethoxy-4-bromophenethylamine, also known as 2C-B, a Schedule I controlled substance;

13. 4-Methyl-N-Ethylcathinone, also known as 4-MEC, a controlled

substance analogue of Methcathinone, a Schedule I controlled substance;

14. 2-(Methylamino)-1-phenyl-pentane-1-one, also known as Pentadrone,

a controlled substance analogue of Methcathinone, a Schedule I controlled

substance;

15. 4'-Methyl-pyrrolidinopropiophenone, also known as MePPP,

a controlled substance analogue of Methylenedioxypyrovalerone (MDPV), a

Schedule I controlled substance;

16. alpha-Pyrrolidinopentiophenone, also known as PVP, a controlled

substance analogue of Methylenedioxypyrovalerone (MDPV), a Schedule I

controlled substance; and

17. Additional analogues of 2,5-Dimethoxy-4-bromophenethylamine,

which is known as 2C-B, a Schedule I controlled substance, which includes,

but is not limited to: 2C-E, 2C-C, 2C-I, 2C-H, and 2C-P, which after July 9,

2012, became Schedule I controlled substances as part of the Food and Drug

Administration Safety and Innovation Act.

The distribution of and N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also

known as 2C-I-NBOMe or 25I-NBOMe, resulted in serious bodily injury and death.

As a further part of this conspiracy, the above-named defendants also did

knowingly and intentionally combine, conspire, confederate, and agree together with

5

others, both known and unknown to the grand jury, to possess with intent to distribute and

did distribute the following controlled substances:  cocaine, a Schedule II controlled

substance; marijuana, a Schedule I controlled substance; ecstacy (3,4-methylene-

dioxymethamphetamine - MDMA), a Schedule I controlled substance; MDA (3,4-

methylenedioxyamphetamine), a Schedule I controlled substance; 2,5-Dimethoxy-4-

bromophenethylamine, also known as 2C-B, a Schedule I controlled substance;

2,5-Dimethoxyphenethylamine, also known as 2C-H, a Schedule I controlled substance;

2,5 Dimethoxy-4-Propylphenethylamine, also known as 2C-P, a Schedule I controlled

substance; and Psilocyn, a Schedule I controlled substance, all in violation of Title 21,

United States Code, Sections 812, 813, 841(a)(1), and 841(b)(1)(C), and Title 18, United

States Code, Section 2.

## Overt Acts

In furtherance of this conspiracy and to effect and accomplish the objects of it, one

or more of the conspirators committed the following overt acts:

1.  It was a part of said conspiracy that the defendants and others would and did

possess with intent to distribute and did distribute a mixture and substance containing a

detectable amount of N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also

known as 2C-I-NBOMe or 25I-NBOMe, within the states of North Dakota, Minnesota,

Texas, Mississippi, and elsewhere;

2.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of N-(2-methoxybenzyl)-4-chloro-2,5-dimethoxyphenethylamine, also known as 2C-C-NBOMe or 25C-NBOMe, within the states of North Dakota, Minnesota, and elsewhere;

3.  On or about June 4, 2012, the distribution of N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, resulted in the hospitalization of S.D.N. in Grand Forks, North Dakota;

4.  On or about June 11, 2012, the distribution N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, resulted in the death of C.A.B. in Grand Forks, North Dakota;

5.  On or about June 11, 2012, the distribution of N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, resulted in serious bodily injury to C.L.J. in Grand Forks, North Dakota;

6.  On or about June 13, 2012, the distribution of N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, resulted in the hospitalization of W.R.S. in Grand Forks, North Dakota;

7.  On or about June 13, 2012, the distribution of N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also known as 2C-I-NBOMe or 25I-NBOMe, resulted in the death of E.R.S. in East Grand Forks, Minnesota;

7

8.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 4-Chloro-2,5-Dimethoxy-amphetamine, also known as DOC, a controlled substance analogue of 2,5-Dimethoxy-4-methyl-amphetamine, also known as DOM, a Schedule I controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

9.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 6-(2-Aminopropyl)-2,3-dihydrobenzofuran, also known as 6-APDB, a controlled substance analogue of  MDA (3,4-methylenedioxy-amphetamine), a Schedule I controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

10.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 1-(1-Benzofuran-6-yl)propan-2-amine, also known as 6-APB, a controlled substance analogue of MDA (3,4-methylenedioxy-amphetamine), a Schedule I controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

8

11.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 4-Acetoxy-N, N-dimethyltryptamine, also known as 4-AcO-DMT, a controlled substance analogue of Psilocyn (4-hydroxy-N,N-dimethytriptamine), a Schedule I controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

12.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 2-Fluoro-amphetamine, also known as 2-FA, a controlled substance analogue of amphetamine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

13.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 2-Fluoro-methamphetamine, also known as 2-FMA, a controlled substance analogue of methamphetamine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

14.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 4-Fluoro-amphetamine, also known as 4-FA, a controlled substance

9

analogue of amphetamine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

15.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 4-Fluoro-methamphetamine, also known as 4-FMA, a controlled substance analogue of methamphetamine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

16.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 5-Methoxy-N,N-diallytryptamine, also known as 5-MeO-DALT, a controlled substance analogue of 5-Methoxy-N,N-diisopropyltryptamine (5-MeO-DiPT), a Schedule I controlled substance, within the states of North Dakota, Minnesota, Texas, and elsewhere;

17.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount 4-Methyl-N-Ethylcathinone, also known as 4-MEC, a controlled substance analogue of Methcathinone, a Schedule I controlled substance, within the states of Mississippi, Texas, and elsewhere;

18.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a

detectable amount of 2-(Methylamino)-1-phenyl-pentane-1-one, also known as Pentadrone, a controlled substance analogue of Methcathinone, a Schedule I controlled substance, within the states of Mississippi, Texas, and elsewhere;

19.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of 4'-Methyl-pyrrolidinopropiophenone, also known as MePPP, a controlled substance analogue of Methylenedioxypyrovalerone (MDPV), a Schedule I controlled substance within the states of Mississippi, Texas, and elsewhere;

20.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of alpha-Pyrrolidinopentiophenone, also known as PVP, a controlled substance analogue of Methylenedioxypyrovalerone (MDPV), a Schedule I controlled substance within the states of Mississippi, Texas, and elsewhere;

21.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute additional analogues of 2,5-Dimethoxy-4-bromophenethylamine, also known as 2C-B, a Schedule I controlled substance, which includes, but are not limited to: 2C-E, 2C-C, 2C-I, 2C-H, and 2C-P, which after July 9, 2012, became Schedule I controlled substances as part of the Food and Drug Administration Safety and Innovation Act;

22.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of Etizolam.  The purpose of distributing Etizolam was to counteract any negative effects of the various hallucinogens distributed as part of this conspiracy;

23.  It was a part of said conspiracy that the defendants and others would and did possess with intent to distribute and did distribute a mixture and substance containing a detectable amount of  marijuana, ecstacy (MDMA), MDA, Psilocyn, and 2,5-Dimethoxy-4-bromophenethylamine, also known as 2C-B, all Schedule I controlled substances, and cocaine, a Schedule II controlled substance, within the states of North Dakota, Minnesota, and elsewhere;

24.  On or about April 30, 2012, in the District of Mississippi, BYRON JOSEPH LANDRY, a/k/a TRIPLESCREW, possessed with the intent to distribute the following:

A.  A mixture and substance containing a detectable amount of 4-Methyl-N-Ethylcathinone, also known as 4-MEC, a controlled substance analogue of Methcathinone, a Schedule I controlled substance;

B.  A mixture and substance containing a detectable amount of 2-(Methylamino)-1-phenyl-pentane-1-one, also known as Pentadrone, a controlled substance analogue of Methcathinone, a Schedule I controlled substance; and

12

C.  A mixture and substance containing a detectable amount of
N-(2-methoxybenzyl)-4-iodo-2,5-dimethoxyphenethylamine, also
known as 2C-I-NBOMe or 25I-NBOMe, a controlled substance
analogue of  2,5-Dimethoxy-4-bromophenethylamine, also known
as 2C-B, a Schedule I controlled substance.

25.  On or about August 24, 2012, in the Southern District of Texas, CHARLES
WILLIAM CARLTON possessed with the intent to distribute 2,5 Dimethoxy-4-
Propylphenethylamine, also known as 2C-P, a Schedule I controlled substance;

26.  On or about August 24, 2012, in the Southern District of Texas, CHARLES
WILLIAM CARLTON possessed with the intent to distribute 2,5-Dimethoxy-
phenethylamine, also known as 2C-H, a Schedule I controlled substance;

27.  It was further a part of said conspiracy that the defendants and others would
and did attempt to conceal their activities;

28.  It was further a part of said conspiracy that the defendants and others would
and did use telecommunication facilities;

29.  It was further a part of said conspiracy that the defendants and others would
and did use United States currency in their drug transactions;

30.  It was further a part of said conspiracy that the defendants and others would
and did distribute controlled substance analogues and controlled substances to juveniles;

13

31.  CHARLES WILLIAM CARLTON used an internet based business named Motion Resources LLC, also known as Motion Research and Resources in Motion, located in Houston, Texas, to facilitate the unlawful importation of controlled substance analogues from various countries including, but not limited to:  China, United Kingdom, Austria, Poland, Greece, Spain, and Canada.  These substances were then unlawfully distributed all over the United States; and

32.  CHARLES WILLIAM CARLTON was a leader, organizer, manager, and supervisor in this conspiracy;

In violation of Title 21, United States Code, Section 846; Pinkerton v. United States, 328 U.S. 640 (1946).

As to Count Three, defendant acknowledges that:

In or about January 2011 through August 2012, in the Districts of North Dakota, Mississippi, Southern District of Texas, and elsewhere,

CHARLES WILLIAM CARLTON;
JOHN ROBERT POLINSKI; and
BYRON JOSEPH LANDRY, a/k/a TRIPLESCREW,

did knowingly and intentionally combine, conspire, confederate, and agree together with Andrew Michael Spofford, et al., currently indicted in the District of North Dakota, Southeastern Division, Case No. 3:12-cr-80, and others, both known and unknown to the grand jury, with the intent to defraud and mislead, to cause to be introduced and delivered for introduction into interstate commerce from outside of the United States to the states of

14

Texas, Mississippi, North Dakota, and elsewhere, the misbranded drugs as listed in Count

One, said drugs being misbranded within the meaning of:

      a.  Title 21, United States Code, Section 352(f)(1), in that their

      labeling did not bear adequate directions for use; and

      b.  Title 21, United States Code, Section 352(f)(2), in that their

      labeling did not bear adequate warnings;

All in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), and

352, and Title 18, United States Code, Sections 371 and 2.

Defendant admits to the Forfeiture Allegation:

Upon the conviction of CHARLES WILLIAM CARLTON of any one of the

controlled substance offense alleged in Count One, in violation of Title 21, United States

Code, Sections 846 and 952,

CHARLES WILLIAM CARLTON

shall forfeit to the United States pursuant to Title 21, United States Code, Section 853,

any and all property constituting or derived from any proceeds the defendant obtained

directly or indirectly as a result of the violations and any and all property used or

intended to be used in any manner or part to commit or to facilitate the commission of the

violations alleged in Count One of this Indictment, including, but not limited to the

following:

      $385,000 in United States Currency

15

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)  cannot be located upon the exercise of due diligence;

      (b)  has been transferred or sold to, or deposited with, a third party;

      (c)  has been placed beyond the jurisdiction of the court;

      (d)  has been substantially diminished in value; or

      (e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above;

In violation of Title 21, United States Code, Section 853.

CHARLES WILLIAM CARLTON will immediately and voluntarily disclose to the United States all domestic and foreign assets in which he has any direct or indirect interest or control, if the assets are the proceeds of unlawful drug activities or were used or intended to be used to facilitate drug activities.

CHARLES WILLIAM CARLTON will assist the United States fully in the recovery of assets, either domestic or foreign, which have been acquired either directly or indirectly through the unlawful drug trafficking activities of his co-defendants, co-conspirators, or other drug traffickers or which were used or intended to be used to

16

facilitate the unlawful drug activities of his co-defendants, co-conspirators, or other drug traffickers.

CHARLES WILLIAM CARLTON will prevent the disbursement of any monies and sale of any property or assets derived from unlawful drug activities as well as those assets used or intended to be used to facilitate unlawful drug activities, if the disbursements or sales are within CHARLES WILLIAM CARLTON's direct or indirect control.

As to the Information, defendant acknowledges that:

From in or about January 2011 through August 2012, in the Districts of North Dakota, Minnesota, Mississippi, Southern District of Texas, and elsewhere,

CHARLES WILLIAM CARLTON

did knowingly and willfully combine, conspire, confederate, and agree together with others to commit an offense against the United States, specifically, to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), in that members of the conspiracy did knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate commerce as described below, which involved the proceeds of a specified unlawful activity, that is, the distribution of analogue controlled substances for human consumption in violation of Title 21, United States Code, Sections 813 and 802(32), and knowing that the transactions were designed in whole and in part to conceal

17

and disguise the nature, location, source, ownership, and control of the proceeds of the said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(h).

Overt Acts

In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the conspirators committed the following overt acts:

1. During the course of and to further said conspiracy, members of the conspiracy sold analogue controlled substances across the United States for human consumption, including, but not limited to: North Dakota, Minnesota, Mississippi, Texas, and elsewhere;

2. During the course of and to further said conspiracy, members of the conspiracy set up an internet website for the mass distribution of analogue controlled substances for human consumption. This website allowed customers to pay for the substances through credit card processing companies in an attempt to portray the business as a legitimate company;

3. During the time frame of the conspiracy there were numerous financial transactions conducted through the use of credit card payments and payments were received by members of the conspiracy through these transactions; and

4.  The purpose of transferring currency in this fashion was to conceal and disguise the nature, source, ownership, and control of the proceeds of the trafficking of analogue controlled substances;

In violation of Title 18, United States Code, Section 1956(h).

7.      Defendant understands the Indictment carries the following maximum

penalties:

COUNT ONE

Imprisonment:      life/20 year minimum mandatory
Fine:                    $1,000,000
Supervised Release: 10 years
Special Assessment: $100

COUNT THREE

Imprisonment:      3 years
Fine:                    $10,000
Supervised Release: 3 years
Special Assessment: $100

INFORMATION

Imprisonment:      20 years
Fine:                    $500,000
Supervised Release: 5 years
Special Assessment: $100

Defendant agrees to pay the Clerk of United States District Court the $300 special assessment on or before the day of sentencing.

8.      Defendant understands that by pleading guilty defendant surrenders rights, including:

19

(a)    The right to a speedy public jury trial and related rights as follow:

(i)    A jury would be composed of twelve (12) lay persons selected at random.  Defendant and defendant's attorney would help choose the jurors by removing prospective jurors "for cause," where actual bias or other disqualification is shown; or by removing jurors without cause by exercising so-called peremptory challenges.  The jury would have to agree unanimously before it could return a verdict.  The jury would be instructed that defendant is presumed innocent and that it could not return a guilty verdict unless it found defendant guilty beyond a reasonable doubt.

(ii)    If a trial were held without a jury, then the Judge would find the facts and determine whether defendant was guilty beyond a reasonable doubt.

(iii)    At a trial, whether by a jury or Judge, the United States is required to present witness testimony and other evidence against defendant. Defendant's attorney can confront and examine them.  In turn, the defense can present witness testimony and other evidence.  If witnesses for defendant refuse to appear voluntarily, defendant can require their attendance through the subpoena power of the Court.

(iv)    At trial, defendant has a privilege against self-incrimination; thus, defendant can decline to testify.  No inference of guilt can be drawn

20

from defendant's refusal to testify.  Defendant can choose to testify, but cannot be required to testify

(b)     Defendant has a right to remain silent.  However, under terms of the Plea Agreement, the Judge will likely ask defendant questions about defendant's criminal conduct to ensure that there is a factual basis for defendant's plea.

9.     Defendant understands that by pleading guilty defendant is giving up all of the rights set forth in the prior paragraph, and there will be no trial.  Defendant's attorney has explained those rights, and consequences of defendant's waiver.

10.     The Court shall impose a sentence sufficient to comply with purposes set forth in the Sentencing Reform Act.  In doing so, the Court shall consider factors set forth in 18 U.S.C. § 3553(a), and must consult and take into account the United States' Sentencing Commission, Guidelines Manual, (Nov. 2012) (USSG).  Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation and Pretrial Services Office of the nature, scope, and extent of defendant's conduct, including all matters in aggravation and mitigation relevant to the issue of sentencing.  The United States expressly reserves the right to appeal from an unreasonable sentence.

11.     This Plea Agreement is binding only upon the United States Attorney for the District of North Dakota.  It does not bind any United States Attorney outside the District of North Dakota, nor does it bind any state or local prosecutor.  They remain free

to prosecute defendant for any offenses under their jurisdiction. This Plea Agreement also does not bar or compromise any civil or administrative claim.

12.    Defendant understands the United States Attorney reserves the right to notify any local, state, or federal agency by whom defendant is licensed, or with whom defendant does business, of defendant's conviction.

13.    The parties agree that the base offense level under the Sentencing Guidelines for defendant's conduct is 38, USSG § 2D1.1(a)(2).

+two levels – USSG § 2S1.1 – money laundering conspiracy

The parties will argue all other guideline calculations and variances under 18 U.S.C. § 3553(a) and make any recommendations they deem appropriate at sentencing.

14.    At sentencing, United States agrees to recommend a two-level downward adjustment for acceptance of responsibility, provided defendant has demonstrated a genuine acceptance of responsibility. (USSG § 3E1.1(a))  The United States further agrees to move for an additional one-level downward adjustment for timely notifying the United States of defendant's intention to enter a guilty plea, thus permitting the Court and the United States to allocate their resources efficiently.  (USSG § 3E1.1(b))

15.    The parties stipulate and agree, that as of the date of this agreement, the defendant appears to qualify for a two-level downward adjustment for acceptance of responsibility.  However, the government may, in its discretion, contest the adjustment under USSG § 3E1.1(a) should the defendant subsequently fail to continue to accept

22

responsibility by failing to abide by the conditions of release, if applicable; by providing false information to the Court, the probation office, or the United States; by unlawfully using controlled substances; by attempting to obstruct justice; by breaching this Plea Agreement; or by acting in a way that is inconsistent with, or failing to act in any way that is consistent with the granting of the adjustment under USSG § 3E1.1(a).

16.     Neither the Court nor the Probation Office is a party to the Plea Agreement. Neither the Court nor the Probation Office is bound by the Plea Agreement as to determining the Sentencing Guideline range. The Court may depart from the applicable guidelines range if the Court, on the record, states factors not contemplated by the Sentencing Guidelines' Commission to justify the departure. Both parties reserve the right to object to any departure. See USSG § 1B1.1, comment. (n.1) (defines "departure"). There may be other adjustments the parties have not agreed upon.

17.     The United States will dismiss Count Two of the Indictment. The United States will not prosecute the defendant for mailing injurious non-mailable items resulting in death, in violation of 18 U.S.C. §§ 1716(a) and j(3).

The amount of restitution will be determined at sentencing.

18.     Defendant acknowledges and understands that if defendant violates any term of this Plea Agreement, engages in any further criminal activity, or fails to appear for sentencing, the United States will be released from its commitments. In that event, this Plea Agreement shall become null and void at the discretion of the United States, and

defendant will face the following consequences:  (1) all testimony and other information defendant has provided at any time to attorneys, employees, or law enforcement officers of the government, to the Court, or to the Federal Grand Jury, may be used against defendant in any prosecution or proceeding; and (2) the United States will be entitled to reinstate previously dismissed charges and/or pursue additional charges against defendant and to use any information obtained directly or indirectly from defendant in those additional prosecutions.  Nothing in this agreement prevents the United States from prosecuting defendant for perjury, false statement(s), or false declaration(s), if defendant commits such acts in connection with this agreement or otherwise.

19.    Defendant acknowledges the provisions of Title 18, United States Code, Sections 2259 and 3663A, which require the Court to order restitution.  Defendant agrees to pay restitution as may be ordered by the Court.  Defendant acknowledges and agrees that the Court will order defendant to make restitution for all loss caused by defendant's conduct, regardless of whether counts of the Indictment will be dismissed as part of this Plea Agreement.  Defendant further agrees to grant the United States a wage assignment, liquidate assets, or complete any other tasks the Court finds reasonable and appropriate for the prompt payment of any restitution or fine ordered by the Court.

20.    The United States will file a Supplement in this case, as is routinely done in every case, even though there may or may not be any additional terms.  Defendant and

24

defendant's attorney acknowledge that no threats, promises, or representations exist beyond the terms of this Plea Agreement.

21.    **Defendant's Waiver of Appeal**.  Defendants have a right to appeal their conviction and sentence (Judgment), unless they agree otherwise.  Appeals are taken to the United States Court of Appeals for the Eighth Circuit (appellate court), pursuant to Title 18, United States Code, Section 3742(a).  The appellate court has ruled that defendants can waive (give up) their right to appeal.  Defendants often waive their right to appeal as part of a plea agreement and in exchange for concessions by the United States.  The appellate court will enforce such waivers.

Defendant and defendant's attorney acknowledge they have fully reviewed and fully discussed the record in this case and all issues that may be raised on appeal.  They have fully discussed defendant's right of appeal and the consequences of waiver. Defendant has decided to waive any right of appeal, except as may be provided herein.

By signing this Plea Agreement, defendant voluntarily waives defendant's right to appeal the Court's Judgment against defendant; and, absent a claim of ineffective assistance of counsel, defendant waives all rights to contest the Judgment in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255.  Defendant reserves only the right to appeal from a sentence that is greater than the upper limit of the Court-determined Sentencing Guidelines range.

Defendant understands that the United States was motivated by defendant's
willingness to waive any right of appeal when the United States chose to offer defendant
terms of a plea agreement.  In other words, the United States was willing to offer certain
terms favorable to defendant in exchange for finality.  Defendant understands and agrees
this case will be over once defendant has been sentenced by the Court.  Defendant agrees
that it will be a breach of this agreement if defendant appeals in violation of this
agreement.  The United States will rely upon defendant's waiver and breach as a basis for
dismissal of the appeal.  Moreover, defense counsel may reasonably conclude and inform
the appellate court that an appeal is wholly frivolous.  Defense counsel may then move to
withdraw, citing Anders v. California, 386 U.S. 738, 744 (1967), and Smith v. Robbins,
528 U.S. 259 (2000).  Defendant agrees an appeal in violation of this agreement should
be dismissed.

By signing this Plea Agreement, the defendant further specifically waives
defendant's right to seek to withdraw defendant's plea of guilty, pursuant to Federal
Rules of Criminal Procedure 11(d), once the plea has been entered in accordance with
this agreement.  The appellate court will enforce such waivers.  The defendant agrees that
any attempt to withdraw defendant's plea will be denied and any appeal of such denial
should be dismissed.

22.     The Assistant United States Attorney and attorney for defendant agree to
abide by the provisions of Rule 32(f) of the Federal Rules of Criminal Procedure.  The

attorneys acknowledge their obligation to use good-faith efforts to resolve any disputes regarding the Presentence Investigation Report (PSIR) through a presentence conference or other informal procedures.

23.     Defendant acknowledges reading and understanding all provisions of the Plea Agreement.  Defendant and defendant's attorney have discussed the case and reviewed the Plea Agreement.  They have discussed defendant's constitutional and other rights, including, but not limited to, defendant's plea-statement rights under Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure.

AGREED:                                    TIMOTHY Q. PURDON
                                           United States Attorney


Dated: _2/10/14_                 By: _____
                                           CHRISTOPHER C. MYERS
                                           Assistant United States Attorney


Dated: _1 - 9 - 14_                  _____
                                           CHARLES WILLIAM CARLTON
                                           Defendant


Dated: _3/10/14_                   _____
                                           ALEXANDER REICHERT
                                           Attorney for Defendant


27